**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOUHAMADOU MARA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>ERNST & YOUNG LLP,<br><br>Defendant. | Case No.<br><br>**CLASS REPRESENTATION**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Mouhamadou Mara ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to his and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Ernst & Young LLP ("EY" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against EY for its failure to secure and safeguard the personally identifiable information ("PII") and financial information (collectively, the "Private Information") of Plaintiff and Class Members.

2. Defendant EY, a limited liability partnership, operates as a "Big Four" accounting firm headquartered in New York, New York. In the regular course of its business, EY provides professional tax services[1] and collects, stores, and maintains the Private Information of individuals and is required to maintain reasonable and adequate security measures to protect such information

---

[1] https://www.ey.com/en_us/about-us (last visited July 22, 2026).

from unauthorized access and disclosure.

3. On April 23, 2026, EY learned that an unauthorized third party had accessed and downloaded documents from a third-party information technology service management platform used to support EY teams performing tax-related work for clients (the "Data Breach").

4. EY owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure. EY breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect customers' and clients' Private Information from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable Private Information stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their customers' and clients' data.

5. EY required its customers and clients to provide sensitive Private Information and failed to protect that information. EY had an obligation to secure customers' and clients' Private Information by implementing reasonable and appropriate data security safeguards. This was part of the bargain between EY and Plaintiff and Class Members.

6. As a result of EY's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted Private Information has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive Private Information stolen here and the fact that the compromised Private Information is likely already being

sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class, as they no longer have control over their Private Information, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7. Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8. Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring EY to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

9. Plaintiff Mouhamadou Mara is a resident of the State of Ohio, and whose personal and financial information has been compromised as a result of the Data Breach.

10. Defendant EY is a limited liability partnership with its principal place of business at One Manhattan West, New York, New York.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

12. For purposes of the Class Action Fairness Act, Defendant EY is deemed to be a citizen of New York, where it maintains its principal place of business, pursuant to 28 U.S.C. §

1332(d)(10). EY maintains its principal place of business in New York, New York.

13. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and conducts business in this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant has its principal place of business in this District, conducts business in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

## GENERAL ALLEGATIONS

15. This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress EY's willful and reckless violations of his privacy rights. Plaintiff and the other Class Members are individuals whose Private Information was collected, maintained, and stored by EY in connection with professional tax services and related client work.

16. Between March 28, 2026, and April 12, 2026, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' Private Information.

17. This action pertains to EY's unauthorized disclosures of Plaintiff's Private Information that occurred during the Data Breach.

18. EY disclosed Plaintiff's and the other Class Members' Private Information to unauthorized persons as a direct and/or proximate result of EY's failure to safeguard and protect their Private Information.

19. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, EY assumed legal and equitable duties and knew or should have known it was responsible for protecting the Private Information from unauthorized disclosures.

20. Despite recognizing its duty to do so, EY failed to implement security safeguards to protect Plaintiff's and the Class Members' Private Information.

21. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on EY to keep their Private Information confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

**A. The Data Breach**

22. According to a data breach notification ("Breach Notice") sent to Plaintiff and Class Members, unauthorized access to EY's third-party information technology service management platform occurred between March 28, 2026, and April 12, 2026. During this period, an unauthorized third party accessed and downloaded documents containing personal and financial information, including Social Security numbers, financial account codes, and credit and debit account information.

23. Upon detecting the anomalous activity on April 23, 2026, Defendant initiated its incident response procedure and worked with an independent cybersecurity firm to investigate the incident, confirm that the unauthorized access had been stopped, and secure its systems. However, Defendant did not begin notifying affected individuals until on or about July 2026, when it first informed individuals that their Private Information may have been compromised in the Data Breach, including by filing notices with the California Attorney General's Office and Vermont Attorney General's Office on July 16, 2026. During that entire period, Plaintiff and Class Members were unaware that their Private Information had been compromised and were unable to take any protective measures.

24. The Breach Notice did not specify detailed measures or actions taken by EY to fully

remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

**B. Defendant's Data Security Obligations and the Applicable Standard of Care.**

25. As a professional services firm that creates, receives, maintains, and transmits sensitive personal and financial information, Defendant is required to maintain reasonable data security measures to protect that information from unauthorized access and disclosure. Although certain statutes and regulations do not provide a private cause of action, federal and industry data-security standards establish the duty-of-care framework that informs the reasonable-security obligations of businesses handling sensitive personal and financial information, including Defendant.

26. Reasonable data security requires entities, among other things, to: (a) ensure the confidentiality, integrity, and availability of sensitive personal and financial information that the entity creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) implement administrative, physical, and technical safeguards reasonably designed to protect the confidentiality, integrity, and availability of such information.

27. In addition to the duty-of-care framework set forth above, Defendant's data-security obligations are informed by widely recognized federal and industry guidance. The Federal Trade Commission has long advised businesses that reasonable data security includes building security into operations from the outset, employing access controls and strong authentication, conducting network monitoring and segmentation, providing secure remote access, applying

timely patches, and implementing secure development practices.[2] The FTC has further explained that reasonable security includes inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning ahead for breaches.[3]

28. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for businesses.[4] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

29. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[6]

30. Highlighting the importance of protecting against phishing and other types of data

---

[2] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.
[3] *See* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[4] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[5] *Id.*
[6] *Id.*

breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect Private Information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

31. The National Institute of Standards and Technology ("NIST") has published a comprehensive catalog of security and privacy controls that establishes objective benchmarks for reasonable security, including controls for access management, incident response, risk assessment, audit logging, authentication, and vendor management.[7] NIST has further published current best-practice guidance on incident response that aligns with the NIST Cybersecurity Framework 2.0.[8]

32. The Center for Internet Security has published the CIS Critical Security Controls, a prioritized and actionable set of safeguards that maps to NIST and other authoritative frameworks and represents the consensus industry best practice for reasonable security.[9]

33. Federal regulators and industry authorities have published cybersecurity guidance identifying practical safeguards that organizations are expected to implement to address significant threats, including email protection, endpoint protection, access management, data protection, vulnerability management, and incident response. Such guidance identifies foundational practices that organizations should prioritize, including vulnerability mitigation, email security, multi-factor

[7] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.
[8] *See* Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.
[9] *See* Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.

authentication, encryption, credential management, and incident planning.

34. Federal regulatory guidance has long confirmed that basic safeguards and cyber preparedness obligations applicable to Defendant are longstanding expectations rather than novel or emerging duties.

35. The Cybersecurity and Infrastructure Security Agency ("CISA"), in conjunction with the Multi-State Information Sharing and Analysis Center, has published the #StopRansomware Guide, which prescribes basic, well-established measures that organizations—including businesses holding sensitive personal and financial information—are expected to implement to mitigate the threat of ransomware and similar intrusions, including phishing-resistant multi-factor authentication, prompt installation of operating-system and software updates, and ongoing user training.[10]

36. By collecting, using, and storing Plaintiff's and Class Members' Private Information for its commercial benefit, Defendant assumed a duty to implement and maintain reasonable security measures consistent with applicable federal and industry standards. Defendant's duty included, but was not limited to, encrypting Private Information at rest and in transit, implementing multi-factor authentication, deploying logging and monitoring systems sufficient to detect intrusions, maintaining current operating systems and software patches, training its workforce on data security and phishing risks, and implementing reasonable policies and procedures to detect, respond to, and contain security incidents.

### C. The Data Breach was Preventable

37. The Data Breach was eminently foreseeable. The professional services and financial sectors have long been leading targets of cyberattacks, and Defendant knew, or, in the

[10] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025).

exercise of reasonable care, should have known, that its network and the Private Information stored on it were likely targets of cybercriminals.

38. Federal regulators have repeatedly warned businesses about the foreseeable risk of cyberattacks. Federal and industry cybersecurity guidance has been promulgated because cyberattacks against businesses are known to be common, foreseeable, and devastating to consumers. CISA has likewise issued ongoing public guidance regarding ransomware and similar intrusions.

39. Numerous publicly reported cyberattacks against businesses handling sensitive personal and financial information in the years preceding the Data Breach put Defendant on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted. Businesses have repeatedly been the subject of high-profile cyberattacks resulting in the compromise of personal and financial information in volumes ranging from tens of thousands to tens of millions of records. The financial services sector's sustained position as one of the most-targeted sectors for cyberattacks is well documented.[11]

40. Had EY maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded customer and client data. EY's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

41. EY was at all times fully aware of its obligation to protect customers' and clients' Private Information and the risks associated with failing to do so. EY knew that information of the

[11] *See* Identity Theft Resource Ctr., 2025 Annual Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (healthcare sector ranked second-most targeted industry with 534 compromises in 2025, behind only financial services (739); it had been the single most-targeted sector each year from 2018 through 2023 and remained among the top two in both 2024 and 2025).

type collected, maintained, and stored by EY is highly coveted and a frequent target of hackers.

42. This exposure, along with the fact that the compromised Private Information is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:




43. By 2013, it was being reported that nearly one out of four data breach notification recipients became a victim of identity fraud.[12]

44. Stolen Private Information is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

45. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[13]

---

[12] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

[13] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

46. In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[14]

47. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[15]

48. In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patients' personal information."[16]

49. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news

---

[14] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide s/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[15] *Id.*
[16] *Id.*

complaints as revenge against those who refuse to pay."[17]

50. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[18]

51. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII/PHI] belonging to victims from countries all over the world. One of the key challenges of protecting PII/PHI online is its pervasiveness. "As data breaches in the news continue to show, PII/PHI about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[19]

52. The Private Information of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from

[17] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[18] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C .pdf.

[19] *Stolen PII/PHI & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/st olen-PII/PHIramifications-identity-theft-fraud-dark-web/.

$40 to $200, and bank details have a price range of $50 to $200.[20] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

53. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[23]

54. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

---

[20] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[21] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[22] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

[23] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

55. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

56. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

57. The Private Information compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[25]

58. Once Private Information is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional Private Information being harvested from the victim, as well as Private Information from family, friends, and colleagues of the original victim.

59. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

---

[24] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[25] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

60. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

61. Data breaches facilitate identity theft, as hackers obtain consumers' Private Information and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' Private Information to others who do the same.

62. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use Private Information to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[26] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[27]

63. The exposure of Plaintiff's and Class Members' Private Information to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

**D. The Impact of Data Breach on Victims**

64. EY's failure to keep Plaintiff's and Class Members' Private Information secure has severe ramifications. Given the highly sensitive nature of the Private Information stolen in the Data

[26] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[27] *Id.*

Breach, Social Security numbers, financial account codes, and credit and debit account information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

65. The Private Information exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the Private Information to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit tax-related and financial fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

66. Further, malicious actors often wait months or years to use the Private Information obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen Private Information, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

67. Given the confirmed exfiltration of customer and client Private Information from EY, many victims of the Data Breach have likely already suffered significant harms, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial statements, checking credit reports, and spending time and effort searching for unauthorized activity.

68. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[28]

69. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[29]

70. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

---

[28] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

[29] *Id.*

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

71. The unauthorized disclosure of sensitive Private Information to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[30]

72. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

73. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

---

[30] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

b. Unauthorized use of their Private Information without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their Private Information permitted by EY without their permission;

e. Identity theft and fraud resulting from the theft of their Private Information;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being in the possession of one or more unauthorized third parties.

74. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[31]

[31] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

75. Plaintiff and Class Members place significant value in data security. According to a survey conducted by the cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider with better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[32]

76. Plaintiff and Class Members have a direct interest in EY's promises and duties to protect Private Information, i.e., that EY would *not increase* their risk of identity theft and fraud. Because EY failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by EY's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for EY's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' Private Information.

77. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their Private Information permitted through EY's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's Private Information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable

[32] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

78. Plaintiff and Class Members have an interest in ensuring that their Private Information is secured and not subject to further theft, as EY continues to hold their Private Information.

**E. Defendant Failed to Implement Reasonable Security Measures.**

79. Notwithstanding the foreseeable risk of a cyberattack and the well-established standards of care set forth above, Defendant failed to implement reasonable security measures sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized access.

80. The Data Breach itself is evidence that Defendant's data-security practices fell below the applicable standard of care. Upon information and belief, had Defendant implemented industry-standard measures—including, without limitation, encryption of stored Private Information, phishing-resistant multi-factor authentication, network segmentation, robust logging and monitoring systems, prompt patching of known vulnerabilities, secure backup procedures, and adequate workforce training — the unauthorized third party would have been detected and stopped before Private Information could be removed from Defendant's network.

81. Defendant's failure to detect the unauthorized access for some period of time and its lengthy delay in completing its investigation and notifying affected individuals further reflect

deficient incident-response capabilities inconsistent with the standard of care set forth in NIST SP 800-61 Rev. 3 and the FTC's *Data Breach Response: A Guide for Business* (Aug. 2023).[33]

**F. Plaintiff's Experience**

82. Plaintiff is a citizen of the State of Ohio and a customer and client of Defendant. As a condition of receiving tax-related services from Defendant, Plaintiff entrusted Defendant with his Private Information.

83. In connection with receiving professional tax services from EY, Plaintiff was required to provide EY with Plaintiff's Personal Information, including Plaintiff's Social Security number, financial account codes, credit and debit account information, and certain financial information contained in or used to prepare tax filings. Plaintiff did so with the reasonable expectation that EY would safeguard that information.

84. Plaintiff received a notification letter from EY informing him that Plaintiff's Private Information was potentially compromised in the Data Breach.

85. As a direct and proximate result of the Data Breach, Plaintiff has experienced a marked increase in unsolicited telephone calls regarding taxes, including suspected scam and phishing calls.

86. Plaintiff has experienced a marked increase in spam emails following the Data Breach and was notified by NetSpend that his Personal Information was found on the dark web. Plaintiff has not yet taken steps to mitigate the consequences of the Data Breach, but will continue to monitor incoming communications and evaluate additional protective measures such as credit monitoring and the placement of fraud alerts or credit freezes.

87. Plaintiff has suffered, and will continue to suffer, anxiety, concern, and emotional

[33] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

distress arising from the loss of control over his Personal Information and from the imminent and ongoing risk that his Personal Information will be used to commit identity theft, fraud, or tax-related identity theft against him.

88. Plaintiff did not consent to EY's release of his Personal Information to unauthorized third parties, and he would not have provided his Personal Information to EY—or would have provided less of it—had he known of EY's deficient cybersecurity practices.

**G. Injuries Suffered by Plaintiff and the Class.**

89. As a direct and proximate result of the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, injury and damages, including, but not limited to:

a) the unauthorized acquisition and disclosure of their Personal Information by criminal third parties, and the corresponding loss of privacy and confidentiality in that information;

b) a substantial and certainly impending increased risk of identity theft, financial fraud, tax-related identity theft, and other forms of misuse of their Personal Information—risks that justify and require ongoing expenditures for protective and remedial services;

c) lost time, lost productivity, and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach, including the costs and effort associated with monitoring credit and financial accounts, placing and lifting fraud alerts and credit freezes, monitoring tax-related records and communications, and obtaining identity theft and credit monitoring services;

d) the diminished value of their Personal Information, for which there is a well-documented economic market;

e) anxiety, concern, and emotional distress arising from the loss of control over their Personal Information and the ongoing risk of misuse of that information;

f) a marked increase in unsolicited telephone calls, electronic messages, and other communications consistent with the misuse of their Personal Information;

g) the deprivation of the benefit of the bargain in their commercial relationship with Defendant, in that they paid Defendant (directly or through their clients or financial institutions) for tax-related services, and a portion of that consideration was understood to be allocated to the protection of their Personal Information, a service Defendant failed adequately to provide; and

h) the continuing risk to their Personal Information, which remains in Defendant's possession and continues to be subject to further unauthorized access in the absence of adequate remediation.

## CLASS ACTION ALLEGATIONS

90. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed class (collectively, "the Class"), defined as follows:

> **Nationwide Class**
> All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

91. Excluded from the proposed Class are any officer or director of EY; any officer or director of any affiliate, parent, or subsidiary of EY; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

92. **Numerosity:** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from EY's own records.

93. **Commonality and Predominance:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether EY engaged in the wrongful conduct alleged herein;

b. Whether EY's inadequate data security measures were a cause of the Data Breach;

c. Whether EY owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their Private Information;

d. Whether EY negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their Private Information;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether EY failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' Private Information;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

94. EY engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in both quantity and quality by comparison to the numerous questions that dominate this action.

95. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their Private Information accessed by and/or disclosed to unauthorized third parties. EY's misconduct affected all Class Members in the same manner.

96. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

97. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to

the burden and expense that would be required to litigate their claims on an individual basis against EY, making it impracticable for Class Members to individually seek redress for EY's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create the potential for inconsistent or contradictory judgments, increasing delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Class Against Defendant)*

98. Plaintiff realleges paragraphs 1 through 97 as if fully set forth herein.

99. Plaintiff brings this claim individually and on behalf of the Class.

100. To obtain professional tax services and related services, Plaintiff and Class Members were required to provide non-public personal and financial information to EY. Plaintiff and Class Members are current or former customers and clients of EY who entrusted their sensitive Private Information to EY in connection with those services. That information was collected, stored, and maintained by EY as part of its operations, and Plaintiff and Class Members reasonably expected EY to safeguard their information consistent with its legal and contractual obligations.

101. By collecting, storing, sharing, and using individuals' data on the Defendant's computer network for commercial gain, EY owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' Private Information from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing

its data security systems to ensure that Plaintiff's and Class Members' Private Information in Defendant's possession was adequately secured and protected.

102. Defendant owed a duty of care to Plaintiff and Class Members to maintain data security according to industry standards and other relevant requirements. Defendant was also responsible for ensuring their systems, networks, and personnel adequately protected the Private Information.

103. Defendant's duty of care to use reasonable security measures arose from the relationship between EY and Plaintiff and Class Members, who entrusted their sensitive Private Information to EY in connection with professional tax services and related client work. This duty is recognized by applicable laws and regulations, as well as common-law principles requiring reasonable care in safeguarding confidential information. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

104. Defendant's duty was to implement reasonable security measures to safeguard confidential data from both intentional and unintentional use or disclosure. This included establishing appropriate administrative, technical, and physical safeguards to protect the privacy of sensitive personal and financial information, including Social Security numbers, financial account codes, and credit and debit account information.

105. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

106. EY breached its duties by failing to exercise reasonable care and failing to

safeguard and protect Plaintiff's and the other Class Members' Private Information.

107. It was reasonably foreseeable that EY's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' Private Information would result in an unauthorized third-party gaining access to such information for no lawful purpose.

108. As a direct result of EY's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' confidential information, Plaintiff and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

109. Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

110. EY's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

111. As a result of EY's above-described wrongful actions, inaction that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information

compromised as a result of the Data Breach; and (vii) the diminished value of data-security protections promised for Plaintiff' information.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Class)*

112. Plaintiff realleges paragraphs 1 through 97 as if fully set forth herein.

113. When Plaintiff and Class Members provided their Private Information in connection with obtaining professional tax services from EY, and EY thereafter collected, stored, and maintained that information as part of its tax and accounting operations, Plaintiff and Class Members entered into implied contracts with EY under which EY agreed to reasonably safeguard and protect their Private Information.

114. EY solicited, received, accessed, stored, and processed Plaintiff's and Class Members' Private Information as part of its regular tax and accounting operations, including professional tax services and related client work. Plaintiff and Class Members provided their Private Information to EY with the reasonable expectation that it would be safeguarded and protected from unauthorized access.

115. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that EY's data security practices complied with relevant laws and regulations, and adhered to industry standards applicable to the protection of sensitive personal and financial information.

116. Plaintiff and Class Members paid money for tax-related services, with the reasonable belief and expectation that a portion of those payments would be used to implement and maintain adequate data security measures. EY failed to maintain reasonable and adequate data security.

117. Plaintiff and Class Members would not have entrusted their Private Information to

EY in connection with obtaining professional tax services in the absence of the implied contracts under which EY agreed to keep such information reasonably secure.

118. Plaintiff and Class Members would not have provided their Private Information to EY, or permitted that information to be collected and maintained by EY, absent EY's implied promises to monitor its computer systems and networks and to adopt reasonable data security measures to protect that information from unauthorized access.

119. EY breached its implied contract with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

120. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

121. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

122. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and identity protection services to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Nationwide Class)*

123. Plaintiff realleges paragraphs 1 through 97 as if fully set forth herein.

124. Plaintiff and Class Members conferred a benefit upon EY in the form of their Private Information, which EY collected, stored, and used in connection with professional tax services and related client work, with the implicit understanding that EY would adequately safeguard the Private Information entrusted to it. Additionally, EY received payment for tax-

related services provided to Plaintiff and Class Members.

125. EY accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members, including access to, use of, and reliance upon their Private Information in the ordinary course of its tax and accounting operations. EY further benefited financially from providing tax-related services to Plaintiff and Class Members while retaining and utilizing their sensitive information.

126. As a result of EY's conduct, Plaintiff and Class Members suffered actual damages.

127. EY should not be permitted to retain monies paid to it for tax-related services involving Plaintiff's and Class Members' information because EY failed to adequately implement the data privacy and security procedures required by applicable laws and industry standards.

128. EY should be compelled to provide, for the benefit of Plaintiff and Class Members, all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**DECLARATORY JUDGMENT (28 U.S.C. §§ 2201, 2202)**
*(On Behalf of Plaintiff and the Class)*

129. Plaintiff realleges paragraphs 1 through 97 as if fully set forth herein.

130. An actual controversy has arisen between Plaintiff and Class Members on the one hand, and Defendant on the other, concerning Defendant's data security obligations to safeguard the Private Information of Plaintiff and Class Members and the adequacy of Defendant's ongoing data security practices.

131. Plaintiff and Class Members continue to be at substantial and continuing risk of injury arising from the permanent compromise of their Social Security numbers, financial account codes, credit and debit account information, and other Private Information, and they remain dependent on Defendant's ongoing data security practices to prevent further unauthorized access to or disclosure of their Private Information that may remain in Defendant's possession or in the

possession of Defendant's affiliates, program partners, and service providers.

132. Defendant's ongoing data security practices have not been demonstrated to be reasonable, and Defendant continues to maintain Private Information regarding Plaintiff and Class Members in environments substantially similar to those that were compromised in the Data Breach.

133. Plaintiff and Class Members seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) Defendant's existing data security practices are not reasonable and do not comply with applicable legal and industry standards, including Section 5 of the Federal Trade Commission Act; (b) Defendant owes a continuing duty of care to safeguard the Private Information of Plaintiff and Class Members; and (c) Defendant must implement and maintain reasonable administrative, technical, and physical safeguards, consistent with Section 5 of the Federal Trade Commission Act and current industry standards, to protect the Private Information of Plaintiff and Class Members on an ongoing basis.

134. Plaintiff and Class Members also seek such further necessary or proper relief based on the declaratory judgment as the Court may grant pursuant to 28 U.S.C. § 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against EY, as follows:

(a) Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

(b) Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

(c) Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent EY from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and tax-related identity theft;

(d) Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e) Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f) Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: July 22, 2026

Respectfully submitted,

*/s/ Robert R. Jimenez*

Robert R. Jimenez (NY. Bar No. 5814249)
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
(786) 206-7896
rjimenez@brysonpllc.com

*Counsel for Plaintiff and the Putative Class*